**FIDELITY UNION INS. CO. et al. v. HUTCHINS et al.**

No. 1686.

Court of Civil Appeals of Texas. Eastland.

Sept. 24, 1937.

Rehearing Denied Dec. 17, 1937.

Curtis White, of Dallas, Wagstaff, Har-
well, Wagstaff & Douthit, and Cox &

Hayden, all of Abilene, and Seay, Malone & Lipscomb, of Dallas, for appellants.

Kirby, King & Overshiner, of Abilene, for appellees.

GRISSOM, Justice.

Plaintiffs, Tate and G. B. Hutchins, minors, and the only children of G. B. Hutchins, Sr., and Eula Hutchins, by their next friend, A. A. Tate, sued defendants, G. B. Hutchins, Sr., Fidelity Union Insurance Company, and Commercial Casualty Insurance Company, on Hutchins' bond as community survivor or administrator. Plaintiffs alleged in substance: That their mother, Eula E. Hutchins, died in 1926, intestate; that the community estate of their father and mother was of the value of $32,000; that on August 6, 1928, G. B. Hutchins, Sr., qualified as community survivor and executed a bond as such for $23,000 with Fidelity Union Casualty Company as surety, which was duly approved; that said community administrator breached the conditions of said bond and did not faithfully administer the community estate as required by law; that he did not keep the account required by article 3670; that he mixed and mingled community funds and property with his separate property by depositing moneys received from the sale of community property with separate property in banks to his individual account and paid out said funds by checks drawn indiscriminately thereon for both individual and community expenses, keeping no account as to which were individual and which community, and mixed and mingled community property with his separate property so that same became indistinguishable; that he mortgaged and exchanged community property for other property, not to pay community debts, but for his own use and benefit; and for the benefit of the second community; that he collected rents and revenues from the community property without keeping account thereof and used the same for his own personal benefit and converted all the community property to his own use; that he failed and refused to pay over to the plaintiffs one-half the surplus of said community property after the payment of community debts; that he sold, mortgaged, exchanged, and converted to his own use and lost all the community estate and failed to deliver any part of the community estate, or proceeds thereof, to plaintiffs; that he mismanaged, wasted, destroyed, and converted to his own use all the community property and thereby committed a devastavit; that plaintiffs were entitled to recover one-half of the value of the community estate, after deducting the community debts, at the time Hutchins, Sr., qualified as community administrator.

Plaintiffs alleged in detail the property that came into the hands of the community administrator, its value and the way and manner in which he disposed of same; they charged the administrator did not exercise reasonable diligence and ordinary care in attempting to collect certain notes of the estate (which he failed to collect) and in his management generally of the estate.

Plaintiffs alleged that from August, 1928, to January, 1931, the administrator collected rents and revenue from the community estate amounting to $11,944, and from January 1, 1931, to October 21, 1933, $2,082.71, or a total of $14,076.61, which he converted to his own use.

The court found the following property constituted the assets of the community estate at the time of the qualification of the community administrator; that its value was as hereinafter shown; and that the debts of the community estate were as hereinafter shown:

| | |
|---|---|
| 320 acres, value | $ 8,000 |
| 3 lots | 3,000 |
| 2 Herring V. L. notes | 1,200 |
| 5 Standefer V. L. notes | 1,000 |
| Merrick notes aggregating $8700 (amt. collected) | 125 |
| Hamilton note, $250 (amt. collected) | 1,056 |
| Cash in bank | 833 |

(The last two items were not listed in the inventory)

| | |
|---|---|
| Total | $15,214 |

Community debts:

| | |
|---|---|
| Lien on 320 acres to secure debt to State of Texas | $ 468 |
| Lien on 3 lots | 1,000 |
| Total | $ 1,468 |

Net value $13,746

The court deducted the community debts, $1,468, from the community assets of $15,214, leaving the net sum of $13,746, and rendered judgment for plaintiffs for one-half thereof, to wit, $6,873, against Hutchins, Sr., and the defendant insurance companies, with judgment for the insurance companies over against Hutchins, Sr.

Hutchins, Sr., in October, 1927, married his second wife, Lou Conklin. In 1930 she obtained a divorce from him and he paid her $1,000 in settlement of her property rights, and paid $109 as attorneys' fees and court costs out of the estate of the first community, in consideration of which she executed to G. B. Hutchins, Sr., a quitclaim deed to the 320 and 158-acre tracts. After the divorce was granted his second wife, Hutchins, Sr., married a widow with six children, and as a result of said marriage four children were born.

On August 14, 1928, eight days after his qualification as community survivor, Hutchins, Sr., borrowed $5,500, giving as security therefor the 320 acres of land; he borrowed $3,000, giving as security therefor community notes. He acquired 158 acres of land near Lamesa at the price of $15,800. The money acquired by the loan on the half section of land and the money borrowed from the bank, or most of it, was paid to Hubbard, the owner of the 158-acre tract, as part of the purchase price therefor. The three lots in Lamesa, property of the first community were taken in exchange by Hubbard on the 158 acres. Hubbard assumed the payment of the $1,000 debt against said lots and Hutchins assumed payments of a debt of $4,000 against the 158-acre tract. Hutchins paid the debt of $468 to the state.

In June, 1933, the holder of the debt and lien against the 158-acre tract, having obtained judgment, foreclosed the judgment lien and same was sold under execution for the debt assumed by Hutchins.

In May, 1934, the lien securing the $5,500 loan on the 320 acres was foreclosed and the land sold for the principal debt and interest. Hutchins testified that he made no "effort to get an extension of time on this debt (either) before or after suit was filed." Thus it is seen that the administrator, when he qualified, took charge of community property in August, 1928, of the value of, at least, $15,214, against which were debts aggregating $1,468. That the entire estate is gone. That the heirs have received nothing for their one-half interest in said community estate.

At the time the trade for the 158-acre tract was made, the court found there was then no necessity for the payment of the community debts; the deed to the 158-acre tract was made to G. B. Hutchins, Sr., individually, as grantee. He was then married to Lou Conklin Hutchins. The tract was occupied by them as their homestead. Improvements were made thereon and paid for with revenue evidently derived chiefly from the two farms. There was evidence to the effect that the controlling reason for making this trade, whereby the lots were exchanged and the community 320 acres mortgaged and eventually lost, the community vendor's lien notes pledged and the community lots exchanged, was to satisfy the demands of the second wife.

The court found that the foreclosure of the lien on the 320-acre tract was caused by his failure to pay an interest installment amounting to $412.50, due January 1, 1934, and that the loss was not unavoidable. With reference to the loss of the 158-acre tract, the court found the administrator defaulted in one annual payment of interest amounting to $320 due January 1, 1933, which caused it to be foreclosed and sold in September, 1933; that this loss was not unavoidable. The court further found, and the evidence, we think, supports the court's findings, that by the exercise of ordinary care and reasonable diligence Hutchins, Sr., could have secured an extension of time on said interest payments and could have saved both said tracts of land from foreclosure.

The court found that the administrator collected and converted the Standefer and Herring notes; that he collected and converted the Hamilton note prior to January 1, 1931; that he collected $1,530 interest on the Merrick notes and in 1933 traded said notes for cows of the value of $125, all of which was converted to his own use.

The court found that the administrator "sold, mortgaged and wasted the entire community estate so that nothing remained on hand at the time of filing this suit; that by mortgaging the 320 acres and using the proceeds for his own benefit in the purchase of the 158 acres and exchanging the Lamesa lots the same were thereby converted by the administrator." The court further found the allegations of the plaintiffs' amended petition with reference to keeping account as required by article 3670 to be true; that Hutchins "sold, mortgaged, and exchanged said community property for other property, not for the purpose of paying community debts, but for his own use and benefit and that he collected rents and revenues of said community property without keeping an ac-

count therefor and used the same for his own personal use. That G. B. Hutchins Sr. never paid to the plaintiffs the one half of said community estate which they inherited from their mother, or any part thereof. That said defendant, G. B. Hutchins Sr. after his qualification as survivor in community as aforesaid, mismanaged, wasted, destroyed and converted to his own use all of said community property and thereby committed a devastavit of the same."

The court concluded as a matter of law that plaintiffs were not required to follow the community property; that plaintiffs were entitled to recover against the principal and sureties on the bond, or those that stood in the place of the sureties, one-half the value of the community property, less the community debts, with interest thereon at 6 per cent. from August 14, 1928, and entered judgment accordingly.

■ Had the 158 acres of land been retained and not lost, the heirs of the first community would not have been required to accept said land taken partly in exchange for community property and paid for, in part, by money borrowed by the administrator on real and personal property belonging to the first community; the heirs had the right to treat the transaction as a conversion and to sue the community survivor and his sureties for the value of their interest in the property converted. Hand v. Errington (Tex.Com.App.) 242 S.W. 722, 723. When the 158-acre tract was acquired by Hutchins, Sr., it was at least presumptively the community property of the second marital partnership, and the debt created was the debt of the second community. Moreman v. Roberson (Tex.Civ.App.) 76 S.W.2d 223, 225 (writ refused). Had the property been retained and Hutchins and a wife continued to reside thereon, it would have been affected by her homestead claim. Graham v. Miller, 26 Tex.Civ.App. 5, 62 S.W. 113; Hales v. Peters (Tex.Civ.App.) 162 S.W. 386; Strickler v. Kassner (Tex.Civ.App.) 64 S.W.2d 1025, 1027. The debts so contracted as an incident to acquiring the 158-acre tract were not community debts; they were not charges against the interest of the plaintiffs in the first community estate, yet thereby the remaining interest of the heirs in the community property was forever lost. 31 C.J. § 1334, p. 190, § 1351, p. 202; Brown v. Adams (Tex.Civ.App.) 55 S.W. 761; Faris v. Simpson, 30 Tex.Civ.App. 103, 69 S.W. 1029; Moreman v. Roberson, supra.

Although by virtue of the execution of the bond and compliance with the statute the administrator acquired the power to deal with the property as in the lifetime of his first wife, yet his actions that resulted in loss of the heirs' interest in the estate must, as to them, be done in good faith, and, we think, the fact that the act is done for the benefit of a subsequent community will not relieve the administrator of the first community and his sureties of liability when the administrator fails to deliver to the heirs their part of the community estate, or its value, and fails to account therefor. The condition of the community administrator's bond is not only that he will "faithfully administer" the estate, but also that he "will pay over onehalf the surplus thereof after the payment of the debts." We see no good reason why the conditions of the bond do not condemn a principal and his sureties where the principal (community survivor) does not tender the property, or its value, to the heirs, unless it be shown that the estate was exhausted by payment of community debts, "unavoidable losses," expenses, and commissions, as provided by article 3670. There was ample evidence that the loss of the heirs' interest was not unavoidable. Moreman v. Roberson, supra. Certainly when such relationship exists it is the duty of the administrator to use ordinary care and prudence in the protection and preservation of the heirs' interest in the community estate and failing therein the administrator and the sureties on his bond are liable to the heirs for the value of their interest in the estate.

■ Our courts have held, in effect, that when the survivor takes charge of the community estate, same being granted to him by virtue of his bond, etc., the survivor is charged with (a) the heirs' one-half interest in the estate, plus (b) the increase and (c) profits of same, and he is credited with (1) community debts, (2) unavoidable losses, and, ordinarily, (3) necessary and reasonable expenses, and (4) a reasonable commission for the management of same. Article 3670 requires the community administrator to " * * * account to the legal heirs of the deceased for their interest in such estate, and the increase and profits of the same, after deducting therefrom all community debts, unavoidable losses, necessary and reasonable expenses, and a reasonable commission for the management of the same." Leather-

wood v. Arnold, 66 Tex. 414, 417, 1 S.W. 173.

There is a substantial difference between the authority of a survivor and a community administrator who has qualified as required by article 3667. Articles 3668 and 3669. The enlarged powers are granted to the community administrator upon his qualifying as such because "the bond required stands for the children's interest in the community" and the community administrator upon qualifying as such "is dismissed from the control of the court with the simple admonition to keep correct accounts." Simkins Admn. of Estates in Texas (2d Ed.) pp. 527, 528. "The bond takes the place of the property and covers such community property as is in the hands of the survivor at the time of the execution of the bond and proceeds thereof subsequently coming into the hands of the survivor." 31 C.J. § 1368, p. 212. "The bond takes the place of the property and the proceeds from any subsequent sale thereof. Where the survivor sells community property and converts the proceeds to his own use the sureties are liable to the other owners for their proportional part of the same with interest from the date of sale; and in order to relieve the sureties from liability for property to which the heirs are entitled, it must be shown the heirs received it." 14 Tex.Jur. § 783, p. 620.

"The right of the survivor in community to the absolute management of the common estate is secured by the statute, only in the event that a bond with sufficient sureties, and conditioned as the statute directs, is filed. * * *

"The sureties upon the * * * bond are, of course, liable for his waste and mismanagement of the property. * * *

"For the value of the assets invested by the survivor, at least to the amount of the bond, the sureties are liable, and to this extent they become debtors to the estate. The bond takes the place of the wasted property, and a cause of action upon it exists." Brown v. Seaman, 65 Tex. 628.

"The authority and power given a community administrator are broad and conclusive. His bond and his fair dealing with the property are the protection given by the law to the minor children of the husband and his deceased wife." Brunson v. Yount-Lee Oil Co., 122 Tex. 237, 243, 56 S.W.2d 1073, 1075.

"The heirs will look to the bond in lieu of the property, should it not be in the hands of the survivor when distribution is made." Ball v. Bankers Life Co. (Tex.Civ. App.) 103 S.W.2d 1111, 1114.

"The bond executed by McGraw took the place of the deceased wife's interest in the community estate." McGraw v. Merchants' & Planters' Nat. Bank (Tex. Civ.App.) 34 S.W.2d 633, 634 (writ refused).

"Having given bond under the statute (article 3667, R.S.), the father had the power to dispose of the property (article 3663, R.S.); and the only remedy available to the children was on the bond." McGraw v. Foxworth-Galbraith Lumber Co. (Tex. Civ.App.) 27 S.W.2d 554, 556 (writ dismissed).

"The bond, their only source of indemnity, must be proceeded upon in the court having jurisdiction of the amount." Huppman v. Schmidt, 65 Tex. 583.

Houston Fire & Marine Ins. Co. v. Swain (Tex.Civ.App.) 114 S.W. 149; Schneider v. Sellers, 98 Tex. 380, 84 S.W. 417, 420; Graham v. Miller, 26 Tex.Civ.App. 5, 62 S.W. 113; Howell v. Fidelity Lumber Co. (Tex.Com.App.) 228 S.W. 181; Coleman v. Coleman (Tex.Civ.App.) 293 S.W. 695, 700; Advance-Rumely Thresher Co. v. Blevins (Tex.Civ.App.) 248 S.W. 1086; Tucker v. Imperial Oil & Development Co. (Tex.Civ.App.) 233 S.W. 339; In re Chapman's Estate (Tex.Civ.App.) 213 S.W. 989; Watkins v. Hall, 57 Tex. 1; Brunson v. Yount-Lee Oil Co., 122 Tex. 237, 243, 56 S.W.2d 1073; McGraw v. Broach (Tex.Civ. App.) 27 S.W.2d 250; Neaves v. Griffin (Tex.Civ.App.) 80 S.W. 420; Belt v. Cetti, 100 Tex. 92, 93 S.W. 1000; Simons v. Ware (Tex.Civ.App.) 219 S.W. 858; Guy v. Metcalf, 83 Tex. 37, 18 S.W. 419; Wingo v. Rudder, 103 Tex. 150, 124 S.W. 899; 18 C.J. 1031.

Article 3670 provides:

"The survivor shall keep a fair and full account and statement of all community debts and expenses paid by him, and of the disposition made of such community property; and, upon final partition of said estate, shall account to the legal heirs of the deceased for their interest in such estate, and the increase and profits of the same, after deducting therefrom all community debts, unavoidable losses, necessary and reasonable expenses, and a reasonable commission for the management of the same."

The court found:

"That the defendant, G. B. Hutchins Sr., did not keep a full and fair account of all community debts and expenses paid by him and of the disposition made by him of such community property and in fact, kept no account of community debts and expenses paid by him and the disposition of community property made by him; of the increase in profits of the same; of unavoidable losses and necessary and reasonable expenses; but on the contrary mixed and mingled community funds and property with his separate property by depositing moneys received from the sale of community property, rents and revenues therefrom to his individual account in the State National Bank, the Lamesa National Bank and other banks and he paid out said funds by checks thereon, drawn indiscriminately, both for his individual expenses as well as community expenses, keeping no account as to which were individual and which were community.

"That said defendant, G. B. Hutchins Sr., sold, mortgaged and exchanged said community property for other property, not for the purpose of paying community debts, but for his own use and benefit and that he collected rents and revenues of said community property without keeping an account therefor and used the same for his own personal use.

"That G. B. Hutchins Sr. never paid to the plaintiffs the one half of said community estate which they inherited from their mother or any part thereof.

"That said defendant, G. B. Hutchins Sr., after his qualification as survivor in community as aforesaid, mismanaged, wasted, destroyed and converted to his own use all of said community property and thereby committed a devastavit of the same."

█ The court's findings are supported by the evidence. The community administrator delivered to the heirs none of the property in which they had a one-half interest and paid them none of the proceeds thereof; he failed to keep the account required by the statute and failed to account to the heirs for any of the property or the income therefrom, or the value of either; the losses were found by the court not to be "unavoidable losses"; they were certainly not "unavoidable" as a matter of law. This was a question of fact determined against the defendants and supported by the evidence.

"Article 3601 provides that the interest of the heirs in the community estate must be accounted for with the increase and profits of the same, after deducting all community debts, unavoidable losses and necessary and reasonable expenses, and a reasonable commission for managing the same. This reduces the inquiry in the settlement of the community estate to one of fact, as the use of the words 'reasonable', 'necessary' and 'unavoidable' must be determined by the circumstances of each particular case, and whether there has been shown in the administration the ordinary care of a prudent man." Simkins Administration of Estates in Texas (2d Ed.) 541, 542.

█ It is true that upon the trial the sureties presented the individual ledger sheet of Hutchins, Sr., retained by the banks with which he had accounts during the period in controversy. These ledger sheets showed the amounts and dates of deposits and withdrawals from said accounts. These did not show, nor was it shown otherwise, in most instances, from what source the deposits came, nor for what purpose the withdrawals were made. Also, such transactions as were reflected by the deed records were shown. Hutchins testified: "I have no canceled checks covering that period nor any receipts, pages of account books, other data or memorandum showing said receipts or expenditures other than such as may be contained in bank statements during that period and I am unable to identify and segregate the various items of deposit and withdrawals in said account. I did not keep any book of account thereof." Hutchins testified that "most" of the money received from the estate was deposited in banks. As to some of the withdrawals he testified they were used to pay taxes, interest, and living expenses. We are of the opinion that such general, indefinite, and incomplete statements relative to a few out of many items of receipts and disbursements did not constitute such an accounting as is contemplated by the statute. 43 A.L.R. 607, 608; Robb v. Robb (Tex.Civ.App.) 41 S.W. 92, 95; Coleman v. Coleman, supra.

█ An attorney for plaintiffs advised Hutchins, Sr., not to come to the trial. His depositions had previously been twice taken and he had been subjected to a most thorough examination as to all receipts and disbursements and all matters relating to an accounting and was apparently unable to make anything more than the

general statements heretofore indicated. Appellees contend that such action on the part of plaintiffs' attorneys prevented an accounting and that plaintiffs are thereby estopped from asserting a failure to account. We do not believe that such is the necessary result. Hutchins, Sr., may be insolvent and not disturbed by a judgment against him and may be pleased with a judgment against him and his sureties in favor of his sons, but if he has violated the provisions of his bond and the law and the heirs have thereby lost their interest in the estate, such attitude on the part of the community administrator should not defeat recovery by the minor heirs who were not shown to be in collusion with him. We cannot know that if personally present he could have added anything to defendants' efforts at accounting. We do not think the action of the court in this respect was error.

In Coleman v. Coleman (Tex.Civ.App.) 293 S.W. 695, 700 (writ refused), the court said:

"The survivor kept no account as is required by art. 3670, R.S.1925, showing a fair and full account and statement 'of all community debts and expenses paid by him, and of the disposition made of such community property; and, upon final partition of said estate, shall account to the legal heirs of the deceased for their interest in such estate, and the increase and profits of the same, after deducting therefrom all community debts, unavoidable losses, necessary and reasonable expenses, and a reasonable commission for the management of the same.'

"It was shown that the property belonging to the community estate was largely used in a way to pay debts incurred somewhat largely by the survivor individually, and, having made no satisfactory report or accounting, the court was justified in treating the only community debt existing at the time the bond was given as having been extinguished and in protecting the minor children from the effect of his administration of their community funds by the judgment in favor of the children on the bond."

■ Said case is sufficient authority to authorize, under the facts of the instant case, a judgment against the community administrator and the sureties on his bond for the value of the heirs' interest in the estate, less the community debts, because of the failure of the community adminis-

trator to keep an account and to account to the heirs as required by article 3670.

■ The court charged the community administrator with the value of the heirs' interest in the community property (as it existed on the date he qualified as such and at the time it was mortgaged, exchanged, and pledged as security for the purpose of acquiring the 158 acres as a homestead satisfactory to his second wife); the court did not charge the administrator and his sureties for all "the increase and profits" from the community estate; it did deduct "all community debts"; it did not credit them with "unavoidable losses" but held there were none. It did not credit the administrator with "a reasonable commission for the management" of the heirs' interest in the estate. This did not constitute error. Because of his failure to account, and under the facts disclosed by the record, we do not think the court was required, if authorized, to allow a commission. The administrator did not intend charging the heirs for his services. Certainly if eight days after his qualification he, in effect, disposed of the estate by mortgaging, exchanging, and pledging the property of the estate in order to acquire the 158 acres for his own benefit and that of the second community, and not for the interest of the heirs and, as a result of lack of care and prudence, lost the estate for the heirs, he is in poor position to demand compensation for such acts, and the other defendants are in no better position. See Strickler v. Kassner (Tex.Civ.App.) 64 S. W.2d 1025.

■ The heirs could not be charged with one-half the expenses of the second or third community, nor for the expenses incident to their board, lodging, and education. It was not proved that their services were not equal to their expenses. The heirs worked to produce crops from the farms and were not paid for it. It was primarily the duty of the father to support his children. The father made no charge and certainly under the facts of this case his sureties cannot. Linskie v. Kerr (Tex. Civ.App.) 34 S.W. 765, 766; Moore v. Moore (Tex.Civ.App.) 31 S.W. 532, 534; Richardson v. Overleese, 17 Tex.Civ.App. 376, 44 S.W. 308, 310.

We think "necessary and reasonable expenses" are not shown.

■ The administrator's bond is conditioned "that he will faithfully administer

such community estate and pay over one half the surplus thereof after the payment of debts with which the whole of such property is properly chargeable" to (in this case) the heirs. Article 3667. We think a community administrator has not faithfully administered the community estate if he fails to keep an account and fails to comply with other provisions of article 3670. He is charged with the heirs' interest in the community property (one-half thereof), he is also charged with the increase and profits thereof. If it is shown that community debts, unavoidable losses, necessary and reasonable expenses, and a reasonable commission (the things with which he may be credited) are not equal to the charge against him and he fails to deliver property equal to the difference in such charge and credit, or the value thereof, to the heirs, then we think it is at least prima facie established that he has not faithfully administered the estate and a recovery is authorized against the administrator and his sureties for such difference.

To hold otherwise would be in effect to say that by virtue of his bond he is empowered to deal with the community estate as his own to sell, mortgage, pledge, lease, and speculate with it as he chooses, but regardless of his purpose, his lack of care, etc., the loss shall fall upon the heirs and not the administrator and his sureties whose bond made such acts by the community administrator possible.

▮▮▮ The defendants (appellants here) complain of the judgment for interest at 6 per cent. from October 18, 1928, on the value of the heirs' interest in the estate. Certainly, in so far as the judgment is based upon the administrator's failure to account, there is error. The heirs could not compel an accounting until twelve months after the qualification of the survivor. Article 3681. No demand is shown prior to the bringing of this suit. We think interest on the value of the heirs' interest in the estate after deduction of community debts, to wit, $6,873, could not be charged prior to the demand evidenced by filing of this suit on the 8th day of December, 1934. 33 C.J. § 123, pp. 233, 234 and § 130, p. 236; Lipsitz v. First Nat. Bank of Gordon (Tex.Com.App.) 296 S. W. 490, 491.

The insurance company defendants are Fidelity Union Insurance Company and Commercial Casualty Insurance Company. The Fidelity Union Casualty Company signed Hutchins' bond as surety. In 1930 Fidelity Union Casualty Company and Fidelity Union Insurance Company were consolidated and Fidelity Union Insurance Company took over all of the assets of Fidelity Union Casualty Company and assumed all its liabilities and agreed "to discharge as its own all of the liabilities of Fidelity Union Casualty Company of every character whatsoever."

January 1, 1931, a contract was entered into between Fidelity Union Insurance Company, referred to in the contract as "Fidelity," and Commercial Casualty Insurance Company, therein referred to as "Commercial." For the sake of brevity we shall refer to said companies as they are referred to in said contract.

In the contract it is provided: "Commercial hereby assumes * * * all of the realnet policy liability of Fidelity on the following classes of business * * * surety."

"Commercial agrees to fulfill all of the obligations of 'Fidelity' under the policies or contracts reinsured by virtue hereof, and to adjust all claims thereunder at its own expense, and to pay all claims thereunder as therein provided." It provided that it was intended that "Commercial" might act "therein in all respects as if it had issued said policies or contract" "it being the intention of this agreement that 'Commercial' shall take the place of 'Fidelity' as to said policies and contracts in all respects." The contract provided, however, that "Commercial" had no liability for any loss occurring prior to January 1, 1931.

▮▮▮ With reference to said last-mentioned clause, it is our view that the community survivor's duty to account was a continuing duty and that it would continue if not from the execution of the bond, then from the expiration of the twelve months' period thereafter, until barred by limitation, unless sooner discharged by compliance with the statutes.

The judgment of the trial court is modified so that it will bear interest from the 8th day of December, 1934, instead of August 14, 1928, and as so modified it is affirmed.

On Rehearing.

FUNDERBURK, Justice.

This suit is not one brought by the plaintiffs to compel a partition and distribution of the community property, as provided in R.S.1925, art. 3681. According

to the pleadings and prayer for relief, the suit is not one seeking to enforce an accounting by said community administrator. It is a suit seeking recovery, on the bond of G. B. Hutchins against him and his sureties, of the sums or amounts in which plaintiffs' claim to have been damaged as the result of alleged devastavits and/or conversions by the community administrator of their interest, as heirs of their mother, in said community estate.

When Hutchins' bond and the inventory and appraisement were approved and filed, Hutchins, as community administrator, then possessed all the rights and powers "to control, manage and dispose of such community property" as should seem to him to be "for the best interest of the estate" [including the right of "suing" and liability of "being sued with regard to same"] in the same manner as during the lifetime of his deceased wife. R.S.1925, art. 3669. The powers and rights thus vested in him were not only as broad and comprehensive as any he could have had if he had qualified as regular administrator of his wife's estate and guardian of the estate of his children, and in each such capacity had under proper and necessary orders of the probate court exercised the fullest powers such court could by such orders legally authorize, but even broader and more comprehensive. For examples, he had the right, without liability to the heirs, to sell the community homestead, although free and clear of any liens or charges, and apply the proceeds to the payment of unsecured community debts. Stone v. Jackson, 109 Tex. 385, 210 S.W. 953; Wiener v. Zweib, 105 Tex. 262, 141 S.W. 771, 147 S.W. 867; Martin v. McAllister, 94 Tex. 567, 63 S.W. 624, 56 L.R.A. 585; Watts v. Miller, 76 Tex. 13, 13 S.W. 16; Ashe v. Yungst, 65 Tex. 631; Watkins v. Hall, 57 Tex. 1. He had the right to use the proceeds from the sale of community property to pay debts barred by limitation. Stone v. Jackson, supra; Dawson v. Holt, 44 Tex. 174, 179. The long mooted question apparently has at last been settled finally that the right of the survivor to qualify under the statutes and thereby be empowered to sell and convey community property is not dependent upon the existence of debts. Brunson v. Yount-Lee Oil Co., 122 Tex. 237, 56 S.W.2d 1073. It was so held in Dawson v. Holt, supra, Cordier v. Cage, 44 Tex. 532, 533, Morse v. Nibbs (Tex. Civ.App.) 150 S.W. 766, and Stone v. Light

(Tex.Civ.App.) 228 S.W. 1108, but the question like Bancho's ghost would not down. That the community administrator has much broader powers than an ordinary administrator has been often declared. James v. Turner, 78 Tex. 241, 14 S.W. 574; Carter v. Conner, 60 Tex. 52; Hollingsworth v. Davis, 62 Tex. 438; Huppman v. Schmidt, 65 Tex. 583; Moody v. Smoot, 78 Tex. 119, 14 S.W. 285. That powers unavoidably liable to abuse are vested in the community administrator by the statutes was at an early day recognized by the Supreme Court. It was said: "We are aware that this view of the law places the destinies and fortunes of the offspring in the power of the father, but in forming general laws and rules it is questionable whether any safer or more disinterested custodian of the rights and welfare of the child has ever been devised than that of the father. That this rule is liable to abuse is not a sound argument against it." Dawson v. Holt, supra.

The obligation of the community administrator's bond—stated as a unity—is that "he will faithfully administer such community estate, and pay over one half of the surplus thereof after the payment of the debts with which the whole of such property is properly chargeable to such person or persons as shall be entitled to receive the same." R.S.1925, art. 3667. It has sometimes been said that such bond stands in lieu of the property, but only in a very general sense can that be regarded as an accurate statement. It is not true that the obligation of the bond is substituted for all interest of the heirs in the property. Manifestly, if that were true, the heirs would have no right to compel partition as provided in R.S.1925, art. 3681, or under any circumstances to waive claim of liability on the bond and sue directly for the property. The mother's interest in community property vests in her children at the time of her death, whatever character of administration may be had. Belt v. Cetti, 100 Tex. 92, 93 S.W. 1000, 1002; Miller v. Miller (Tex.Civ.App.) 227 S.W. 737; Hales v. Peters (Tex.Civ.App.) 162 S.W. 386. Such title is no more divested by qualification of the community administrator than it would be by the qualification of a regular administrator. If the corpus of all property remained on hand until the administration was completed and the heirs were tendered their interest in same, it is quite clear, we think, that they could not refuse to accept it, and yet have an action on the

bond as for a devastavit or conversion for one-half the value of such property.

These observations are made in order to show more clearly what must be the true nature and functions of a bond of the kind in question. Such a bond when its provisions are closely examined is seen to impose two distinct obligations, each of which affords indemnity against very different things. The obligation to "faithfully administer such community estate" is an indemnity against acts or omissions which are fraudulent or mala fides. The other obligation to "pay over one-half the surplus thereof, after the payment of the debts with which the whole of such property is properly chargeable, to such person or persons as shall be entitled to receive the same" is an indemnity against failure or refusal of the community administrator for any reason to pay over the one half surplus "after the payment of the debts with which the whole of such property is properly chargeable." The first obligation is to provide indemnity to creditors and heirs against loss resulting from devastavits and/or conversions. It takes the place of wasted property. Brown v. Seaman, 65 Tex. 628. The second obligation indemnifies heirs (not creditors) and may operate without reference to the existence of any fraudulent or mala fides acts or omissions. Each of the two things indemnified against being of such distinctly different natures, may naturally require a different character of action to enforce the indemnity. In one character of action an essential element would be a showing of fraud or bad faith. In another, only the existence of a surplus and failure to pay one-half of it when due and demanded might be sufficient to fix the liability.

Let us consider now some of the reasons and authorities which seem to compel the above conclusions. Take the first provision of the bond obligating the survivor to "faithfully administer" the community estate. In granting and defining the powers and duties of community administrators, the lawmakers seem to have considered no distinction between persons possessing a high degree of sound judgment, care, and prudence and other persons not so fortunately gifted. The provision of law as to all alike is that after taking the requisite steps to qualify, thereby vesting the survivor with the exclusive management, control, and disposition of the community property, those powers should be exercised by the husband (when the survivor) after

the death of his wife "in the same manner *as during her lifetime, or sanity."* (Italics ours.) R.S.1925, art. 3663. Here is the test for determining the extent of, and limitations upon, the rightful powers of the survivor. As to the management, control, and disposition of the community property, his powers, rights, and duties are the same as while the wife was living. What powers over community property can a husband exercise during the lifetime of his wife, and while she is sane, without incurring a legal liability to her? The answer to this question should answer the question of what are the powers of the survivor? The answer is that, except as to some special restrictions regarding the homestead, he can do anything that he could do if he were the sole owner, provided only his actions and conduct be free from mala fides or fraud. The undertaking to "faithfully administer" the community estate cannot be held to indemnify against anything other than fraudulent or mala fides acts or omissions without having the effect, contrary to the plain declarations of the statute, of limiting or restricting the powers and rights of the husband which he possessed during the lifetime and sanity of the wife, to manage, control, and dispose of the community property. In order to give effect to all provisions of the law, the obligation to faithfully administer must be given a construction which will leave the surviving husband, as a community administrator, free to exercise the power and right to manage, control, and dispose of the community property "in the same manner as *during her lifetime, or sanity."* (Italics ours.) This would seem to be self-evident. Let us, therefore, now pass to a more detailed consideration of the second of the two obligations of the bond. The obligation to "pay over one-half the surplus," etc., indemnifies against a failure of duty which obviously could not have existed during the lifetime of the deceased spouse. It is therefore a duty, the enforcement of which involves no limitation or restriction upon the exercise of those powers and rights of management, control, and disposition which he had in the lifetime of his wife. The surplus, one-half of which, the bond requires the administrator to pay over, is the surplus "after the payment of the debts," etc. As a means of determining the nature and amount of the debts and expenses and the fact of their payment, and the property available for such payment, and also as a

means of ultimately determining the surplus available for distribution, other statutory provisions impose other duties upon the community administrator. It is provided that the "survivor shall keep a fair and full account and statement of all community debts and expenses paid by him and of the disposition made of such community property," etc. R.S.1925, art. 3670. Thus is imposed a duty both to creditors and heirs. While the creditors have no interest in the ultimate surplus, the interest of the heirs in such surplus makes them interested in the debts and expenses which determine the surplus. Would a failure of duty as imposed by the provision just quoted alone constitute such fraud or bad faith as to give rise to a cause of action in favor of the creditors or heirs for a devastavit or conversion—a tort? It is not believed that the statute, properly interpreted, can be given such effect. As in substance already said, such duty cannot be made to qualify or restrict the right of management, control, and disposition of property *in the same manner* as during the lifetime or sanity of the wife. It would have that effect, if, from mere ignorance, inattention or any other reason not involving fraudulent or bad faith actions or omissions, his failure to keep accounts should alone be held to be determinative of the existence of claimed devastavits or conversions.

In addition to the duty declared in the language of article 3670 above quoted, the succeeding clause further provides: "and, upon final partition of said estate [community administrator], shall account to the legal heirs of the deceased for their interest in such estate, and the increase and profits of the same, after deducting therefrom all community debts, unavoidable losses, necessary and reasonable expenses, and a reasonable commission for the management of the same." Unlike the duty imposed by the preceding clause, here is declared a duty of the survivor only to the heirs. Its plain purpose is not to afford evidence to convict the survivor of devastavits or conversions, but simply to provide a means of determining the surplus of the estate, after the payment of the debts, or whether there be any surplus, in order that the community administrator may perform, or the heirs enforce, the second obligation of his bond. A breach of this duty may subject the administrator to liability wholly regardless of any fraud or bad faith. In his account he may claim

credit with entire good faith for a loss as being unavoidable, or for expenses or commissions as necessary and reasonable, and yet, in a proper action or proceeding, the court may determine against him that the loss was not unavoidable, or the expenses not necessary or reasonable, or the commission not reasonable, all as a means of establishing the amount of the surplus available, or which should be available for distribution. Under the duty enjoined by the first clause, the survivor may in the utmost good faith pay a debt or expenses which were not legally a debt or expense of the estate but believed to be, and, in a proper action he may be made to restore it as a part of the surplus to be paid over to the heirs. For example, he may pay out of the community funds the current taxes or expenses of repairs on his homestead, honestly believing since it was a part of the community estate that he was entitled to credit for such payments in his final accounting, and yet he would be disallowed such credits under authority of Strickler v. Kassner (Tex.Civ.App.) 64 S.W.2d 1025, which seems to be fully supported by Sargeant v. Sargeant, 118 Tex. 343, 15 S.W.2d 589.

The duty now under consideration is one which by the express terms of the statute comes into existence "upon final partition of said estate." On the subject of the partition of such estates, another statutory provision is that, "After the lapse of twelve months from the filing of the bond by the survivor, the persons entitled to the deceased's share of such community estate, or any portion thereof, shall be entitled to have a partition and distribution thereof in the same manner as in other administrations." R.S.1925, art. 3681. This does not create a right to partition and distribution not otherwise existing. Its necessary effect therefore is rather to prescribe a limitation upon such pre-existing right. It amounts to a declaration that there shall be no partition until twelve months have elapsed, and then the right is given only to the heirs, not the survivor, and is of a continuing nature. Pressler v. Wilkie, 84 Tex. 344, 19 S.W. 436. No reason seems to support the contention that at the end of twelve months the survivor has imposed upon him the duty immediately to make partition or initiate a proceeding in court for that purpose. If any such duty exists, then in perhaps a majority of the cases the advantages of a community administration over an ordinary administration would be

to a great extent lost. The survivor could not pay over money or personal property to minor heirs. A guardianship proceeding would, therefore, have to be instituted which would be entirely unnecessary if the partition or distribution was postponed a few years pending such disability of the heirs. It would seem to be the far more reasonable view that after the twelve months the duty of the survivor to make partition arises only upon demand of one or more of the heirs. If such demand be not made for years, the powers, rights, and duties of the survivor continue. The opinion of Judge Dunklin in Tholl v. Speer (Tex.Civ.App.) 230 S.W. 453, 456, appears to be sound that no article of the statutes provides for a termination of the community administration, except said article 2238 (now article 3681) "and such termination under that article is made dependent upon a demand by the children for a partition and distribution of the estate." See, also, Drought v. Story (Tex.Civ.App.) 143 S.W. 361.

It would seem to be a reasonable conclusion that when it is sought to enforce the duty of the survivor to "account to the legal heirs of the deceased for their interest in such estate," etc., such duty can only be enforced as the basis of recovery upon the second obligation of the bond hereinbefore discussed, and in an action for an accounting incident to and a part of an action for partition and/or distribution. A duty created by statute which provides that it be enforced in an action of a particular kind is only enforceable in such action. Such is the principle applied in the recent decision in Bowyer v. Bowyer (Tex.Com.App.) 109 S.W.2d 741. As said before, the present suit does not purport to be such an action.

In the instant case there was a total absence of evidence to show fraud, or bad faith, necessary to support an action for devastavits or conversions. There was no evidence, more certainly there was insufficient evidence, to support a finding that the survivor ever claimed any interest in the property adversely to the interest of the heirs. The suit was in no sense an action to enforce an accounting or a partition or distribution. The conclusions of fact and law indicate the view that the failure of the survivor to keep and submit formal accounts and statements of his transactions was evidence of the alleged devastavits or conversions. After due consideration, we find ourselves unable to concur in such view, although the literature on the subject well enables us to understand and appreciate how the learned trial judge reached his conclusions upon the point. It was found, in effect, that the survivor by mortgaging the 320-acre tract and using all but $468 of the proceeds of $5,500 as part of the purchase price of the 158-acre tract, and the use of the latter as a homestead with a second wife and its ultimate loss under a foreclosure of liens to secure debts which he had assumed as part of the purchase price, constituted a conversion of the 320 acres, rendering the survivor liable upon his bond for its value of $8,000 at the time of the mortgage. It was further found that the survivor's act in conveying the three lots, then of the value of $3,000, as $3,500 of the consideration for the 158 acres (by which arrangement a debt of $1,024 against the lots was assumed and subsequently paid), and the after history of said 158-acre tract, constituted a conversion of the three lots, rendering the survivor liable for their value in the said sum of $3,000. These conversions were found to have occurred on August 14, 1928, from which time the recovery of legal interest was awarded as part of the damages. Yet another finding was that "on January 1, 1931, practically all of said community property listed in the inventory and appraisement, or its equivalent was on hand or in possession of said G. B. Hutchins, Sr."

If the transactions regarding the 320 acres of land and the three town lots were not conversions of such properties when they took place on or about August 14, 1928—six days after the survivor qualified as such—then we fail to see how any subsequent acts or omissions could have the effect of making them such. Evidently the mere failure of the survivor to keep the accounts and statements was regarded as conclusive evidence, since there was no other. If those transactions constituted conversions of the property, then there could be no liability for devastavits based upon subsequent actions regarding the proceeds. If there was liability for such devastavits, growing out of such subsequent transactions, then there was no liability for conversion of the lands. If the lands were converted, then there could be no further liability based upon failure to account for the value thereof, for the further reason that the value was undisputed. There could be no liability based upon the survivor's failure to render an

accounting of this dealings with the proceeds of the converted lands since if the lands were converted, the proceeds became the property of the conversioner. If there was liability for failure to account for, and pay over, the proceeds, then there was no liability for conversion of the lands; and the devastavits, if any, occurred long after the time the land was found to have been converted.

The evidence seems wholly insufficient to support any finding to the effect that the survivor converted either the 320-acre tract, or the town lots. Under the undisputed evidence by the transaction regarding the 320 acres, the survivor paid a community debt against same of $468. In the transaction regarding the three lots he procured to be paid a community debt of $1,024, which was a lien or encumbrance upon said land. Under such facts no conversion of the land would have been shown had the administrator never qualified but had so acted solely by virtue of his powers as the surviving partner of the marital union. Crawford v. Gibson (Tex.Civ. App.) 203 S.W. 375; Clemmons v. McDowell (Tex.Com.App.) 12 S.W.2d 955; Jones v. Harris (Tex.Civ.App.) 139 S.W. 69. But when his rights and powers be tested by the rules relating to community administrations, the evidence does not remotely suggest any want of power or the existence of any fraud or bad faith. Can it be doubted for a moment that if Hutchins, instead of qualifying as community administrator, had procured himself to be made regular administrator of his wife's estate, and guardian of his two minor children, he could not have obtained proper and valid orders of the probate court authorizing just what he did with reference to mortgaging the 320-acre tract; the employment of the proceeds as he did; the exchange of the town lots as part consideration for the 158 acres; the acquisition of the latter for the price and upon the terms paid and promised? There can it seems be no doubt of it.

The question seems to be wholly unaffected by the fact that the second wife occupied the 158 acres, together with Hutchins and his children, as a home. That would not enable her to impress upon the land homestead rights to the prejudice of the children. Upon any partition her homestead rights would have been confined to the one-half interest of the husband, or at most to homestead rights of the husband to which the interest of the heirs was sub-

ject anyway. 29 C.J. 849, § 167; Clements v. Lacy, 51 Tex. 150; Ferguson v. Reed, 45 Tex. 574; Massillon Engine Co. v. Barrow (Tex.Com.App.) 231 S.W. 368; Crocker v. Crocker, 19 Tex.Civ.App. 296, 46 S.W. 870, 871; Pressley's Heirs v. Robinson, 57 Tex. 453; Gilliam v. Null, 58 Tex. 298; Redding v. Boyd, 64 Tex. 498; Hoffman v. Hoffman, 79 Tex. 189, 14 S.W. 915, 15 S.W. 471. If the 158-acre tract was acquired with community property of the estate in administration, as the evidence and findings conclusively show, and was acquired with the intention that it be the property of said estate in lieu of the property given therefor, of which there was, it seems, no evidence to the contrary, and was acquired for the purpose of having the survivor's homestead transferred from the 320-acre tract to the 158-acre tract, the fact that the survivor had married a second wife who would occupy the new home with him was of no importance. The Legislature has not seen fit to limit the powers and rights of the husband as community administrator to such time as he shall remain unmarried as it has done in the case of the wife as survivor. Article 3680, R.S.1925. Upon the finding set out above, but which may here be repeated, that "On January 1, 1931, practically all of said community property listed in the inventory and appraisement, or its equivalent, was on hand or in possession of said G. B. Hutchins, Sr.," no judgment could properly be rendered, as was done, upon the theory of conversions of practically one-half of the community estate on August 14, 1928, more than two years before. There were findings of other conversions, some apparently not made the basis of the judgment, but which, none-the-less, show the judgment to be erroneous because inconsistent with the grounds upon which it is based. If there was a conversion of the lands, the only thing, it would seem, upon which the value of the land could be the measure of recovery, then there was no conversion or devastavits based upon subsequent dealings or handling of the proceeds; and vice versa.

It would too greatly extend this opinion, already regrettably long, to attempt to point out in detail more specifically other reasons why it is thought the judgment should be reversed. However, for the purpose of making clearer, if possible, the preceding discussion, the following will sketchily indicate what appears to be the rights and remedies of the parties as sug-

gested by the record under the views expressed:

If conversions and/or devastavits can be shown, of course, recovery may be had therefor. That, as said before, would require a showing of fraud or bad faith. A failure to keep an account or statement may well effect the determination of the amount to be recovered, but would not be evidence of fraud or bad faith.

If the pleadings be so redrawn as to seek partition and distribution, and as incidental thereto, an accounting, the record, as it now stands, suggests some liability. There is no original property on hand. There is no surplus to be paid, unless the accounting shows there should be a surplus. It therefore results that the principal feature of any practically available action would be the accounting. If the survivor is outside the jurisdiction of the court, and therefore cannot be forced to render an accounting and fails to do so voluntarily, it would seem that the heirs will be under the necessity of establishing the state of the account by the best evidence available. In that case the court should no doubt resolve all reasonable doubts against the survivor.

When the town lots were conveyed in exchange for a conveyance to the survivor of the 158-acre tract, the agreed value of the lots was $3,500. Of that sum $1,024 was paid (finally) in discharge of a debt on the lots. The survivor was entitled to a credit upon a final accounting for payment of said sum of $1,024. The remainder of the $3,500, or $2,476 went into the purchase price of the 158 acres. The heirs' interest in the 158 acres stood for and in lieu of their interest in the $2,476. When the survivor borrowed $5,500 on the 320-acre tract and executed his obligations to repay it with interest, one-half of the $5,500, or $2,750 was then the property of the heirs. They retained their one-half interest in the land subject to the lien. One-half the obligation to repay the loan was their obligation. When out of the $5,500 the survivor paid $468 in discharge of a debt against the 320 acres, he was entitled to credit for that amount. When he paid the remainder of $5,032 as part of the purchase price of the 158-acre tract, the one-half interest of the heirs in that land stood in lieu of their one-half interest in the $5,032. When the survivor borrowed $3,000 from a Lamesa bank to make up the balance of the cash consideration

for the purchase of the 158 acres, one-half that debt was the debt of the heirs. To the extent that the $3,000 was used in payment for the 158 acres, the heirs' interest therein was transferred to and represented by their interest in the 158 acres. The remainder was chargeable to the survivor, subject to further accounting. The $5,600 indebtedness assumed as part of the consideration for the 158 acres, by such assumption, became a debt of the estate, one-half of which was the debt of the heirs. When the survivor paid interest on the assumed obligations as well as on the $5,500 debt, he was entitled to a credit for the sums so paid. When he paid off the $1,600 principal of the assumed Michner notes, he was entitled to be credited with that amount. When and if he repaid the $3,000 loan to the Lamesa bank, he was entitled to credit for such payment. When the $5,500 debt and the assumed $4,000 debt became due and payment was demanded if the survivor had no community funds with which to pay them, and each of the properties had depreciated in value to such extent that it was worth no more than the debt against it, the loss of the properties would, we think, be unavoidable. If it be granted that some extension could have been procured, that could not be conclusive. It would not warrant the inference that the debt could have been finally paid and the property saved.

So long as the 320 acres of land remained the homestead of the survivor, he was not properly chargeable as survivor with any of the rents or profits therefrom, nor entitled to be credited with taxes, or ordinary repairs. Strickler v. Kassner, supra. When the 158 acres was made the homestead instead of the 320 acres, he was likewise not chargeable with the rents or profits, nor entitled to credit for taxes, ordinary repairs, etc., on the latter, so long as it remained his homestead. But otherwise, when the survivor made payments out of community funds of property, it was his duty to keep accounts or statements showing that such payments were made upon community debts, or expenses, or if partly paid for such, and partly for others, then the part that was paid on the community debts or expenses. We think where it is shown that the survivor came into possession of community funds and when in a proper action called to account, no evidence is produced to show that same were paid on community debts or expenses, or for commissions or were lost, a prima

facie liability on the bond would thereby be established. The jurisdiction of the court would be fully invoked to determine whether claimed losses were legally unavoidable; whether debts and expenses were the debts and expenses of the estate; and the expenses necessary and reasonable; and whether commissions, if any, claimed were reasonable.